McMILLIN, P.J.,
for the Court:
¶ 1. This case involves a dispute over the obligations of Independent Health Care Management, Inc. (IHC) as lessee arising under a lease of a health care facility from the owner, the City of Bruce. The City filed an action in the Chancery Court of Calhoun County seeking a declaratory judgment that IHC had defaulted under the lease and that the City was entitled to have the remaining term of the lease canceled. The City also sought monetary damages and attorney’s fees in the action. The chancellor held in favor of the City on all aspects of the case and IHC has appealed. We affirm in part, reverse and remand in part, and reverse and render in part.
I.
Facts
¶ 2. The City of Bruce owned a health care facility that included a building and equipment suitable for operation of a critical care hospital facility, an emergency room, and an extended care nursing home. Due to circumstances unexplained in the record, the facility was not fully operational in 1992. IHC and the City entered into negotiations toward the goal of having the facility reopened under the management of IHC. Several alternatives were explored before the parties settled on an arrangement whereby IHC would lease the facilities for a primary term of five years with the possibility of an extension for an additional five years. The terms of the agreement were reduced to writing in a lease agreement executed by the parties.
¶ 3. The City of Bruce was not interested in profiting monetarily from the lease. Rather, the City’s primary interest was in having a viable health care facility operating in the City. This fact is best evidenced by two considerations. First, the City passed a general obligation bond issue for $500,000 to be expended on needed improvements and equipment acquisitions that would be used by IHC under the lease terms. Second, the lease provided that IHC’s rental payment for the initial term of the lease for all facilities and equipment, including the $500,000 in improvements and acquisitions financed by the bond issue, would be ten dollars per year.
¶ 4. IHC began immediate operation of the nursing home and reopened the hospital. The emergency room did not reopen immediately, but it was ultimately opened about one year after the lease term commenced. Although the nursing home facility appeared to be operating satisfactorily, all did not go well with the remaining aspects of the operation. Within seventeen months of opening the emergency room facility, IHC closed it down once again, apparently because it could not be operated profitably. A few months later, *884 IHC formally indicated its intention to also shut down the critical care hospital facility, leaving only the nursing home enterprise in operation. However, upon objection from city officials, IHC formally recanted its decision to close the hospital.
¶ 5. During the time that IHC was proceeding with the closing of the hospital facility, it stopped accepting patients. When this occurred, a local doctor who had been serving as chief of staff for the hospital severed his relationship with the institution. After IHC reversed its decision, this doctor refused to resume his position, citing certain perceived problems with the hospital’s operation that had the potential to endanger a patient’s well-being. IHC reduced its hospital support staff to a skeleton crew and there were no staff doctors living in the immediate vicinity. There is evidence in the record that the support staff was only adequate to properly handle two patients at a time. As the facts would have it, this staffing level actually proved to be more than adequate, since the record indicates that from October 1995, through the trial of this case in March 1996, not one patient had been admitted to the hospital.
¶ 6. During this period, IHC underwent a periodic review by the state licensing facility. In order to have a medical doctor as chief of staff for the facility, IHC named a doctor who was affiliated with another IHC operation in Holly Springs as chief of staff of the Bruce facility, though the two operations were some sixty miles apart. There was evidence that this chief of staff only went to Bruce one day a month for staff meetings, never attended a patient in the Bruce community, and never admitted a patient to the Bruce facility.
¶ 7. After some unsatisfactory negotiations in which IHC attempted to purchase the facility from the City, the City filed this action seeking authority to retake possession of the property. In its complaint, the City set out three specific acts of default by IHC that it contended entitled it to the remedy of cancellation of the lease. Those three acts of default were (a) the closing of the emergency room, (b) a defac-to closing of the critical care hospital facility, and (c) the removal from the leased premises of certain equipment belonging to the City and covered under the lease.
¶ 8. The chancellor found, as a matter of fact, that IHC was in material breach of its obligations under the lease and ordered the lease terminated. He issued a lengthy written finding in which he listed multiple transgressions by IHC that, according to the chancellor, warranted termination of the lease.
¶ 9. In support of its claim for monetary damages, the City called a member of the board of aldermen who testified to some extent regarding the terms of the City’s repayment obligation on the $500,000 bond issue. In reliance on this evidence, the chancellor awarded damages to the City for the breach of the lease in the amount of $64,115.73.
¶ 10. In support of its claim for attorney’s fees, the City submitted to the court a statement from its attorneys. This submission occurred after the trial was concluded and showed a charge to the City for representation in this matter of $3,127.65. The chancellor,, without additional hearing, awarded the City attorney’s fees in that amount.
¶ 11. IHC has now appealed, raising four issues.
II.
The First Issue: Whether IHC Committed a Material Breach of the Lease
¶ 12. This aspect of the case actually involves two separate propositions of some gravity together with some peripheral issues that can be disposed of summarily. The first issue is a pure question of law as to whether the closing of the emergency room operation was a material breach justifying lease termination. The second issue is a pure question of fact as to whether *885 IHC did, in fact, cease to operate the critical care hospital facility in contravention of its obligation under the lease. We will consider these two questions separately then proceed to discuss those other findings made by the chancellor concerning allegations of default by IHC.
A.
The Emergency Room Facility
¶ 13. There is no dispute that IHC closed the emergency room facility. Thus, the sole issue before us is one of law. Did the act of closing the emergency room constitute an act of default under the lease? Unlike findings of fact, we afford no deference to the chancellor’s holding on questions of law. Bank of Mississippi v. Southern Mem’l Park, Inc., 677 So.2d 186, 191 (Miss.1996). Instead, we review such holdings de novo. Id.
¶ 14. The parties, in arguing their competing positions on the matter, point to different provisions of the lease. The City cites the Court to Section 3.1. of the lease agreement, which states, in part, as follows:
Lessee shall use the Leased Premises in a careful and proper manner for the operation of a hospital, Hospital Emergency Room and skilled nursing facility.... No other use will be permitted without the prior written consent of Lessor.
¶ 15. The City argues that this provision constitutes an affirmative covenant by IHC that it will operate those named facilities on the property during the term of the lease. The City then points the Court’s attention to Section 6.1., which defines events of default under the lease and states in subpart (b) that an event of default includes the “failure of Lessee to perform any covenant, condition or obligation contained herein.... ”
¶ 16. IHC counters that argument with the proposition that the quoted provision of Section 3.1. is not a covenant creating an affirmative duty on its part, but rather is simply an enumeration of permissible activities that IHC can conduct on the premises. It bolsters this argument by pointing out that Section 6.1.(c) specifically lists the “failure by Lessee to operate a hospital facility and nursing home facility on the Leased Premises” as events of default but that this provision does not mention an emergency room operation. According to IHC’s argument, this precise language, by the glaring exclusion of an emergency room facility, indicates a clear intent of the parties that the operation of an emergency room, though á permissible activity under Section 3.1., was not a mandatory activity under Section 6.1.
¶ 17. It is the duty of the courts to construe and enforce contracts according to their terms so long as those terms are clear and unambiguous. Marcoin, Inc. v. Hammond, 368 So.2d 1257, 1258, 1259 (Miss.1979). It is only when an ambiguity appears between competing terms of the same contract or where the language of the contract is less than clear in its expression of the parties’ intentions that the court must delve further in an attempt to discover and give effect to the true intention of the parties. Our first obligation, therefore, is to decide whether IHC is correct in its assertion that Section 3.1. is only an itemization of approved activities because, if it is, the only possible breach of that covenant would be a claim that IHC had undertaken some activity on the leased premises besides one of the three permitted uses. Only if we decide that Section 3.1. created an affirmative duty on IHC’s part to actively maintain all three activities during the entire term of the lease must we then move to Section 6.1. to determine whether there is an ambiguity between the general provisions of Section 6.1.(b) and the more specific provisions of Section 6.1.(c) that seem to suggest that the failure to operate an emergency room is not an act of default.
¶ 18. In the more typical commercial lease situation, we would have little diffi *886 culty in concluding that a provision similar to Section 3.1. was nothing more than a limitation on the lessee’s permissible scope of activity on the premises and not an affirmative covenant to maintain a particular activity. A tenant who, for example, covenanted to limit his activities to operating a commercial warehouse would be in default if he attempted to operate a restaurant, but would not typically be deemed in default if he temporarily ceased his business activities altogether so long as he remained current on his lease payments and faithfully performed all other obligations under the lease.
¶ 19. However, we face a somewhat different and unique circumstance in this case. The City does not occupy the position of a typical lessor whose primary interest lies in the profit he can reasonably expect to derive from the arrangement. The City’s goal was a more intangible and indirect benefit insofar as the municipal corporation itself was concerned. The City’s purpose was to secure the provision of health-related services to the community without consideration to whether the City derived a direct profit as the owner of the leased facilities. Thus, unlike the typical lessor, the City did have an interest, not only in limiting its lessee to certain specific activities, but also in seeing that its lessee did, in fact, carry on those contemplated activities. The issue remains, however, whether the terms of the lease bind IHC to affirmatively meet the City’s aspirations.
¶ 20. In reviewing the provisions of Section 3.1., this Court is struck by the fact that the language seems to mirror, without substantial deviation, those provisions of a typical commercial lease that serve the sole purpose of restricting the permissible activities of the lessee. We are constrained to interpret this contract according to its plain language and according to the ordinary construction given to such language. Id. In the context of a commercial lease, we conclude that we must give the meaning to the phraseology that is customarily afforded in the setting of commercial leases generally. Thus, we find Section 3.1. to be a provision restricting the lessee in its permissible activities and not one creating an affirmative duty to carry out any particular activity on the premises. Certainly, it would have been possible (and quite easy) to draft a provision that would have clearly stated IHC’s affirmative obligation to maintain an emergency room throughout the entire term of the lease. Absent such a provision, we decline to read such an affirmative duty on IHC’s part into Section 3.1.
¶ 21. We find our conclusion in this regard to be bolstered by two considerations. First, it is undisputed that IHC did not operate an emergency room at the hospital for the first year of the lease term and there is no evidence that the City ever voiced any protest, agitated for the opening of such a facility, or intimated that IHC’s failure to reopen the emergency room constituted a breach of its obligations under the lease. We concede, as the City argues in its brief, that the lease contains a provision that temporary acquiescence in a particular situation cannot be construed as a waiver of a claim of breach. However, we find this evidence persuasive, not that the City was satisfied to waive this breach, but that it did not consider the failure to operate an emergency room to be a breach. Secondly, we find it persuasive, as IHC argues, that Section 6.1.(c), by specifically defining the failure to maintain two of the three permitted activities on the premises as events of default, suggests that the failure to operate the third permitted activity would not constitute a breach of the lease warranting early termination.
¶ 22. Thus, we conclude that the chancellor erred as a matter of law when he concluded that the failure to operate an emergency room facility constituted a material event of default.
B.
The Failure to Operate a Hospital Facility
¶ 23. The facts are uncontradicted that IHC notified the City in late Septem *887 ber 1995 that it intended to cease operating the critical care hospital facility. It was only after IHC became aware that the City considered that action to be a breach of the lease that IHC retracted its formal notice and announced its intention to continue operation of the hospital facility.
¶24. Despite this formal withdrawal of the closure notice, the chancellor found that IHC had, in reality, ceased to operate the hospital by any reasonable construction. IHC contends that this finding constituted a manifest abuse of discretion since it is not supported by any credible evidence in the record.
¶ 25. Our review of the chancellor’s decisions regarding resolution of disputed questions of fact is more limited than our ability to review his interpretation of the law. Because the chancellor is in the courtroom and hears the evidence first hand, he is best positioned to judge the credibility of the witnesses and decide what weight the evidence ought properly to have. Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994). Thus, this Court, on appeal, is permitted to disturb the chancellor’s finding of fact only if we conclude that he was manifestly in error in his findings. Id.
¶26. In support of its position, IHC notes that it has, at all times since the inception of the lease, operated a hospital facility that is licensed by the proper regulatory authorities of the State. It claims that its substantial reductions in staffing levels were merely prudent economic decisions and that, at such time as conditions warrant, it is fully prepared to upgrade staffing levels to those necessary to meet the needs of its patients. IHC claims that it had, since the beginning of the lease, attempted to recruit doctors into the Bruce area who might, in turn, make use of the hospital facilities for the care of their patients. IHC introduced proof that it had, in fact, recruited two doctors to the area, but that they had both subsequently departed for reasons that were beyond IHC’s control.
¶ 27. The City, on the other hand, claims that any assertion that the facility, in the state of operation that prevailed at trial, constituted a bona fide critical care hospital facility was unwarranted. The City points to evidence that the hospital had no laboratory facilities and that all lab work was done under a contract with another facility that only’ picked up materials at certain intervals. A physician testified that such a practice was not consistent with good patient care, especially in urgent or emergency situations involving cardiac patients. There was evidence that the hospital pharmacy had, for all intents and purposes, ceased to function. We have already recited the evidence concerning the hospital’s chief of staff, and his apparent lack of real involvement in the facility’s operation. The City argues that the arrangement was merely a sham necessary to maintain licensure. The City points out that IHC’s original by-laws for the operation of the facility called for the chief of the medical staff to live within twenty-five miles of the facility and that, when regulatory officials questioned this apparent violation, the hospital simply amended its bylaws to permit a chief of staff physician to live sixty miles away. The City also relies on the undisputed fact that, at the time of hearing, the hospital had not admitted a patient in over six months and suggests that, based on the manner in which IHC was operating the facility, the expectation of ever having a patient admitted to the facility was essentially non-existent.
¶28. On this aspect of the case, this Court cannot say that the chancellor was manifestly wrong in holding that the hospital had, in reality, ceased to operate. It may well be that circumstances beyond IHC’s control rendered its operation of the hospital facility extremely difficult and unprofitable. Yet, by entering into a lease that contained a provision that the failure to operate a critical care hospital would constitute an event of default, IHC specifically assumed that risk. In so deciding, this Court does not imply any finding of *888 misconduct on the part of IHC. The company did not affirmatively contract that it would, without any regard to cost, maintain a critical care hospital facility for the entire five year period of the lease. It only agreed that, if it ceased to operate such a facility, the City would be entitled to terminate the lease and reassume possession of the leased premises. Those áre two materially different propositions and, as will be seen later, have a profound impact on determining some of the remaining questions presented in this appeal.
¶ 29. We hold that the chancellor in this case was not manifestly incorrect when he concluded that on or about September 28, 1995, when IHC indicated its intention to close the hospital facility and ceased to admit patients, an event of default occurred under Section 6.1.(c) of the lease agreement. We also conclude that the chancellor was not manifestly in error when he further found that IHC’s halfhearted attempts to keep the facility open under bare bones conditions that essentially guaranteed that no physician would admit a patient to the facility did not cure the default. His holding that for all practical purposes the hospital operation effectively ceased to exist as a viable operation by any reasonable construction does not appear manifestly wrong on this record. We, therefore, affirm the chancellor’s holding that IHC breached one of the core provisions of the lease in a material way and that this breach entitled the City to terminate the remaining term of the lease.
C.
Additional Events of Default
¶ 30. The chancellor found a number of other events of default by IHC, most of which were not raised in the pleading. Many of these were minor violations at best and had long since been cured by IHC. There is no purpose to be served by discussing these matters since they have been rendered moot by our conclusion that the failure to operate a legitimate critical care hospital facility was, in itself, a material breach justifying termination of the lease.
III.
Issue Two: Damages of $64,115.73
¶ 31. The only evidence related to the City’s damage claim consisted of an alderman’s testimony concerning the City’s scheduled repayment of the bonds issued to finance the improvements to the facility. It is difficult to see how IHC’s failure to operate the hospital facility damaged the City in this regard. The bonds were general obligation bonds of the municipality, and it was never contemplated that hospital revenues would be available to retire the bonds. In fact, by the specific terms of the lease, the most revenue the City could receive during the five year lease term was fifty dollars. Despite these facts, the chancellor took the City’s annual payment on the bond issue of $59,183.75 and divided that by twelve to arrive at an imputed monthly bond obligation to the City of $4,931.98. He then assessed damages for the breach of the lease as follows:
That the Defendant, through its wilful actions which resulted in breach and termination of the Lease Agreement, shall pay damages equal to the 13 months period which existed on the unexpired Lease Agreement at the time the Plaintiff was legally entitled to regain control; further, that this total amount of damages due on the unexpired, breached Lease Agreement is $64,115.73.
¶ 32. Damages, whether arising out of contract or tort, must be the result of an actual injury. McDaniel Bros. Constr. Co. v. Jordy, 195 So.2d 922, 925 (Miss.1967). Whether IHC continued to operate the hospital facility or not, the City’s obligation under its bond covenants would remain unchanged. Had IHC operated a first-rate facility for the entire five years of the lease and produced millions of dollars in revenue, the City would not have received *889 any of those sums to pay on the bonded indebtedness. There simply is no logical or legal correlation between IHC’s default under the lease and the City’s totally separate obligation to pay its bonds. The chancellor’s decision to assess damages on this basis appears to be nothing more than the extraction of a penalty from IHC for its act of default.
¶33. There is the added consideration, mentioned earlier in this opinion, that IHC never affirmatively covenanted to operate a hospital for the entire five years of the lease. It was not the prerogative of the chancellor to impose such an obligation on IHC and then substantially penalize the corporation for its failure to do so. All IHC contracted for was the right of possession of the premises for five years conditioned on, among other things, payment of a minimal rent and an understanding that if it ever ceased to operate either a nursing home facility or a critical care hospital facility during the term of the lease, the City, had the right to terminate any unexpired term on the lease and reclaim the property.
¶34. The chancellor was manifestly in error in the computation and assessment of damages growing out of this breach by IHC. There being no competent proof in the record to support an award of damages under any recognized theory of law, this Court reverses and renders the award of damages.
IV.
The Third Issue: Attorney’s Fees
¶ 35. The chancellor, in his findings and conclusion that predated the final judgment, held that IHC would be responsible for reasonable attorney’s fees. Apparently, the attorneys for the City then presented the chancellor with a statement indicating fees of $2,700. and expenses of $427.65 due for their representation. The chancellor, without further hearing, included an order in the final judgment that IHC reimburse the City in that amount.
¶36. The general rule is that attorney’s fees are not a proper element of damages in a breach of contract suit unless the contract itself provides for them. Stokes v. Board of Dirs. of La Cav Improvement Co., 654 So.2d 524, 529 (Miss.1995). In this case, Section 6.2. provides that, upon default, the City would have the right to retake possession and “institute proceedings for the collection of all sums remaining unpaid by Lessee under this Lease along with reasonable attorney’s fees.” The proper amount of attorney’s fees to award in a situation such as this is a matter vested in the sound discretion of the chancellor. Id. Nevertheless, as in other contested matters, the chancellor’s decision must be based on evidence in the record. The opposing party has a right to be heard on the reasonableness of the requested fees, including the right to present evidence on the question. Griffin v. Griffin, 579 So.2d 1266, 1267 (Miss.1991). The chancellor’s means of determining the proper amount of attorney’s fees, based solely on the ex parte submission by the City’s attorneys, denied IHC the opportunity to test the reasonableness of the request. For that reason, we reverse and remand the matter of reasonable attorney’s fees to be awarded under Section 6.2. of the contract. Those fees should be to be set only after a full evidentiary hearing on the matter.
V.
The Fourth Issue: The City’s Breach
¶ 37. IHC claims that the City committed a breach of the terms of the lease by the act of instituting this suit. Section 6.2. of the lease provides that IHC would be entitled to sixty days written notice from the City of any perceived event of default, during which time it would have the opportunity to cure the default. According to IHC’s argument, it would only be after the expiration of this sixty day period that the City would be permitted to proceed to exercise any of its *890 remedies for breach. IHC claims that the suit was filed less than sixty days after it received formal notice from the City that the City considered IHC in default under the lease.
¶ 38. We cannot agree with this proposition. The City filed a declaratory judgment action under Mississippi Rule of Civil Procedure 57 seeking a determination as to whether IHC’s actions did, in fact, constitute a breach of the lease terms. Rule 57 provides that “[a] contract may be construed either before or after there has been a breach thereof.” M.R.C.P. 57(b)(2). Thus, the mere institution of a declaratory judgment action in an attempt to have the parties’ rights determined cannot be seen as a violation of the provisions of Section 6.2.
¶39. It is true that the City sought additional relief besides a declaratory judgment in the action, but no such relief was granted until substantially more than sixty days had expired after IHC had been put on notice of the City’s position regarding its alleged breach. There were no injunctions or restraining orders entered during the pendency of this suit that would have prevented IHC from moving on a parallel course outside the litigation to cure those acts of default alleged by the City and presenting evidence of those curative actions when the case was ultimately tried. Instead, IHC chose to rely on its rights under the status quo, being of the opinion that it was not in default. So long as IHC remained of that opinion in the face of rather dramatic evidence that the City was of a contrary opinion, it is difficult to envision how the passage of sixty days, or any other period of time, could afford IHC the opportunity to cure an event of default that it was unwilling to concede existed. We, therefore, hold that the institution of this declaratory judgment action by the City less than sixty days after IHC’s decision to close the critical care hospital facility was not a breach of Section 6.2. of the lease entitling IHC to any relief.
¶ 40. THE JUDGMENT OF THE CHANCERY COURT OF CALHOUN COUNTY, INSOFAR AS IT ADJUDICATES THE APPELLANT TO BE IN BREACH OF THE COVENANTS OF ITS LEASE WITH THE APPELLEE IS AFFIRMED. THAT PART OF THE JUDGMENT GRANTING A JUDGMENT IN FAVOR OF THE APPEL-LEE AND AGAINST THE APPELLANT IN THE AMOUNT OF $64,115.73 IS REVERSED AND RENDERED. THE AWARD OF ATTORNEY’S FEES AND EXPENSES TO APPELLEE IN THE AMOUNT OF $3,127.65 IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE TAXED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.
BRIDGES, C.J., THOMAS, P.J, and COLEMAN, HERRING, HINKEBEIN and SOUTHWICK, JJ., concur.
DIAZ, J., dissents with separate written opinion joined by KING and PAYNE, JJ.